GLOBAL NAPS, INC.

v.

**NEW ENGLAND TELEPHONE & TELEGRAPH CO., d/b/a Verizon Massachusetts, et al.**

**No. CIV. A. 00–10938–RWZ.**

United States District Court, D. Massachusetts.

July 11, 2001.

Cameron F. Kerry, Mintz, Levin, Cohn, Ferris, Glovsky & Pope, P.C., Boston, MA, for Plaintiff.

Keefe B. Clemons, Daniel J. Hammond, Assistant Attorney General, Boston, MA, Theodore C. Hirt, U.S. Department of Justice, Federal Programs Branch, James D. Todd, Jr., United States Department of Justice, Civil Division, Washington, DC, for Defendants.

*MEMORANDUM OF DECISION*

ZOBEL, District Judge.

Plaintiff, Global Naps, Inc. ("Global Naps") brings this action seeking a decla-

ration that the Massachusetts Department of Telecommunications and Energy ("DTE") erred in refusing to order defendant Verizon to grant Plaintiff access to certain transmission cables which Verizon owns and operates. Specifically, Plaintiff asserts the DTE incorrectly interpreted and applied Federal law and the rules of the Federal Communications Commission ("FCC"), and prays for an order reversing the decision. In opposition the DTE and its Commissioners argue first that, given the strictures of the 11th Amendment to the United States Constitution, this court lacks subject-matter jurisdiction and, second, that, in any event, its decision is correct and should be affirmed. The DTE is joined by Verizon, which supports the DTE on the merits. The United States intervened solely to oppose defendants' 11th Amendment argument; it does not argue the merits. The parties have stipulated the relevant facts and, upon resolution of the jurisdictional issue, the matter is ripe for decision on the merits.

## Background

Verizon is an "incumbent local exchange carrier" ("ILEC") under the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, (codified as amended in scattered sections of 47 U.S.C.) (the "1996 Act"), meaning that it is one of the "Bell Operating Companies" ("BOCs") which were divested from AT & T in the breakup of the telephone monopoly. 47 U.S.C. § 153(4). For regulatory purposes, the country is divided into "local access and transport areas" ("LATAs"), 47 U.S.C. § 153(25); and, as part of the process for introducing competition into the various markets for communications services, ILECs, such as Verizon, are in general prohibited from providing telecommunica-

tions service across LATA boundaries ("interLATA service") unless they have obtained prior approval from the Federal Communications Commission ("FCC"). 47 U.S.C. § 271.

Global Naps provides communications services to customers in Massachusetts, and to do so uses network infrastructure owned by Verizon. As an ILEC, Verizon is required by 47 U.S.C. § 251(c)(3) to make this infrastructure available to "competitive local exchange carriers" ("CLECs") such as Global Naps.[1] Consequently, on April 15, 1997 Verizon and Global Naps entered into an agreement (the "Interconnection Agreement") establishing the terms and conditions under which Global Naps would have access to Verizon's infrastructure. The Interconnection Agreement was approved by the DTE pursuant to 47 U.S.C. § 252(e)(1), which delegates to state regulatory bodies ("State commissions") authority to review interconnection agreements for compliance with the federal regulatory scheme.

The Interconnection Agreement was amended August 19, 1998 to provide rates, terms and conditions under which Verizon would lease to Global Naps "dark fiber," which is fiber optic cable that has been laid, but has not yet been "lighted" by being connected to transmission equipment. The dark fiber amendment did not distinguish between interLATA and intraLATA fiber. In October, 1998, Global Naps sought to lease dark fiber from Verizon. The dark fiber Global Naps sought to lease would connect its locations in Quincy, Massachusetts, located in the Eastern Massachusetts LATA, and in Springfield, Massachusetts, located in the Western Massachusetts LATA, and is therefore interLATA fiber. Verizon re-

1. I assume for purposes of this decision that Global Naps meets the criteria of a CLEC, though Verizon does not concede the point.

fused to lease the fiber to Global Naps, however, arguing that leasing interLATA dark fiber to Global Naps would constitute the provision of interLATA telecommunications service, prohibited to Verizon under 47 U.S.C. § 271 with out prior FCC approval.

In November, 1998, Global Naps complained to the DTE, requesting that the DTE enforce the Interconnection Agreement and the dark fiber amendment by ordering Verizon to lease to it the requested interLATA fiber. After accepting written arguments and holding a public hearing, the DTE ruled in favor of Verizon. Interpreting the 1996 Act and earlier FCC orders addressing dark fiber, the DTE determined that leasing interLATA dark fiber would constitute the provision of interLATA telecommunications services subject to the strictures of § 271, and that therefore it could not order Verizon to do so unless Verizon had prior FCC approval. *See, Petition of Global NAPS, Inc. against New England Telephone and Telegraph d/b/a Bell Atlantic–Massachusetts regarding dark fiber,* D.T.E. 98–116 (April, 2000) ("D.T.E.98–116"). Global Naps now seeks review of that DTE decision.

## 11th Amendment Immunity

■ As noted, the DTE and the Commissioners argue first that the 11th Amendment to the United States Constitution bars this court from subject-matter jurisdiction to review the DTE decision, an argument that Global Naps and the United States, as intervenor, vigorously oppose.

The 1996 Act delegates to State commissions authority to approve or reject proposed interconnection agreements. 47 U.S.C. § 252(e)(1). Judicial review by State courts of such decisions is specifically prohibited, 47 U.S.C. § 252(e)(4), while review jurisdiction is specifically granted to the federal district courts. 47 U.S.C. § 252(e)(6). The parties agree, by virtue of the grant of approval authority in § 252(e)(1), the DTE had jurisdiction over their dispute, which involves the interpretation and enforcement of an existing interconnection agreement rather than an initial approval or rejection decision. The DTE likewise agrees that the jurisdiction of the federal courts to review State commission determinations, if it exists, includes jurisdiction to review State commission adjudications of disputes arising under existing interconnection agreements.[2] The DTE does, however, argue that this court lacks subject-matter jurisdiction over this dispute pursuant to the doctrine of State sovereign immunity as enshrined in the 11th Amendment and elaborated by the Supreme Court.

Although neither the Supreme Court nor the First Circuit has yet spoken on the issue, the majority of the Circuits that have considered the question have found that the 11th Amendment does not bar federal district court review of State commission decisions. *See, AT&T Communications v. BellSouth Telecomms., Inc.,* 238 F.3d 636 (5th Cir.2001); *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d 323 (7th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 896, 148 L.Ed.2d 802 (2001); *MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah,* 216 F.3d 929 (10th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1167, 148 L.Ed.2d 1026 (2001). *But see, Bell Atlantic Md., Inc. v. MCI Worldcom, Inc.,* 240 F.3d 279 (4th Cir.2001), *cert. granted, in*

---

**2.** This issue has been litigated elsewhere, and is one of three related issues arising under 47 U.S.C. § 252(e)(6) on which the United States Supreme Court has granted certiorari. *See, Ill. Bell Tel. Co. v. Worldcom Techs., Inc.,*

1999 WL 436474, 179 F.3d 566 (7th Cir. 1999), *cert. granted sub nom Mathias v. World-Com Techs., Inc.,* —— U.S. ——, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001).

*part, sub nom Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* — U.S. ——, 121 S.Ct. 2548, 150 L.Ed.2d 715 (2001) and *U.S. v. Pub. Serv. Comm'n of Md.,* — U.S. ——, 121 S.Ct. 2548, — L.Ed.2d —— (2001);[3] *Bellsouth Telecomms., Inc., v. N.C. Util. Comm'n,* 240 F.3d 270 (4th Cir.2001). In finding subject-matter jurisdiction, these courts have not looked to the power of Congress to abrogate State sovereign immunity, which Congress possesses only when legislating under Section 5 of the Fourteenth Amendment, not when exercising its Article I powers, as it did in enacting the 1996 Act. *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 672, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d at 338. Rather, these courts have found jurisdiction based on two alternative doctrines: the doctrine of constructive waiver,[4] and the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[5]

The doctrine of constructive waiver holds that a state will have waived its 11th Amendment immunity and consented to suit if it accepts from Congress a gift or gratuity, the receipt of which is conditioned upon a waiver of sovereign immunity. *College Savings Bank,* 527 U.S. at 686–87, 119 S.Ct. 2219. In interpreting § 252(e)(6), the Fifth, Seventh, and Tenth Circuits have found that Congress extended such a gratuity when it created the opportunity for states to participate in the regulatory scheme established by the 1996 Act, and that Congress made that opportunity conditional upon the acceptance by participating States of federal judicial review of decisions by State commissions. *See, AT&T Communications v. BellSouth Telecomms., Inc.,* 238 F.3d at 645–47; *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.,* 222 F.3d at 341–42; *MCI Telecomms. Corp. v. Public Srvc. Comm'n of Utah,* 216 F.3d at 938–39. I am persuaded that this majority position represents the correct interpretation of the 1996 Act and the 11th Amendment doctrine of the Supreme Court, and therefore hold that this court does have subject-matter jurisdiction over this matter as a result of Massachusetts' consensual participation in the federal regulatory scheme.

■ Jurisdiction is proper also under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which allows a private party to bring suit in federal court against individual State officers, in their official capacities, in order to obtain prospective relief from an ongoing violation of federal law. *Id.* at 159–60, 28 S.Ct. 441. Since the ruling on Massachusetts' constructive waiver of sovereign immunity provides a sufficient basis for the exercise of subject-matter jurisdiction, it is unnecessary to elaborate on *Ex Parte Young.* Suffice it to say that it provides a separate and independent basis for jurisdiction.

Finally, the particular facts of this case present yet a third basis for subject-matter jurisdiction, which is that the DTE and the Commonwealth of Massachusetts explicitly consented to federal district court review of the DTE's decision. The DTE Order at issue states that "[p]ursuant to § 252(e) of the Telecommunications Act of

---

**3.** Oral argument on these cases will be heard in tandem with *Mathias, supra* note 2.

**4.** This is the second issue on which the Supreme Court granted certiorari in *Mathias, supra* note 2.

**5.** This is the third issue on which the Supreme Court granted certiorari in *Mathias, supra* note 2.

1996, appeal of this final Order may be taken to the federal District Court ...." D.T.E. 98–116, at 13. While this is evidence in support of the constructive waiver theory of jurisdiction, discussed above, it also stands alone as an explicit, voluntary waiver of sovereign immunity by the D.T.E. and the Commonwealth.

For the foregoing reasons, the argument of the DTE and the individual commissioners based on sovereign immunity fails. This court has subject-matter jurisdiction.

**Merits of the DTE Decision**

The issue on the merits is whether the DTE was correct in its determination that for Verizon to lease interLATA dark fiber to Global Naps would constitute the provision of interLATA telecommunications service, and that therefore Verizon is prohibited by 47 U.S.C. § 271 from doing so without prior FCC approval. Because Verizon did not have such approval, the DTE refused to order Verizon to provide interLATA dark fiber to Global Naps, as such an order would be in violation of Verizon's obligations under Federal law. This presented the DTE, and now this court, with a question of law.[6]

■ While § 252(e)(6) subjects State commission decisions to federal district court review, it does not specify the standard of review to be applied. Neither the Supreme Court nor the First Circuit have spoken on this issue, but the overwhelming consensus from other circuits is that as a decision of a State commission interpreting and enforcing the 1996 Act, a federal statute, the DTE's decision should be subject to *de novo* review with respect to questions of law, not to the more deferential review accorded under *Chevron U.S.A. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), by federal courts to federal agencies. *Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.*, 235 F.3d 493, 498 (10th Cir.2000); *Southwestern Bell Tel. Co. v. PUC*, 208 F.3d 475, 482 (5th Cir.2000); *GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir.1999); *US West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir.1999), *cert. denied*, 530 U.S. 1284, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000).

■ Global Naps invokes *Chevron* to argue that the DTE owed no deference to the FCC's interpretation of the 1996 Act because Congress has spoken clearly on the issue of whether leasing dark fiber constitutes provision of a telecommunications service. However, *Chevron* addresses the deference a reviewing federal court owes to a federal agency's interpretation of a federal statute, not the deference a state agency interpreting a federal statute owes to the federal agency with primary jurisdiction for administering the relevant statutory scheme. In other words, *Chevron* would provide the standard of review if this court were hearing a challenge to the FCC's interpretation of the 1996 Act, which it is not. The DTE based its decision on its understanding of the FCC's interpretation of the 1996 Act, and this court's *de novo* review of that decision focuses on determining whether the DTE correctly understood and followed the FCC's interpretation of the 1996 Act, and does not extend to a review the FCC's interpretation itself. *Cf. U.S. West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1120 (9th Cir.1999) (where State commission relied upon cost assign-

---

**6.** *But cf., MCIMetro Access Transmission Services, Inc. v. GTE Northwest, Inc.*, No. C97–742WD, 1998 U.S. Dist. LEXIS 11335, at *13–14 (W.D.Wash. July 7, 1998) (treating

issue of whether dark fiber is a network element under 47 U.S.C. § 251(c)(3) as a question of fact, and applying arbitrary and capricious review to State commission's decision).

ment methodology approved by FCC order, for federal court engaged in review under § 252(e)(6) to hear challenge to legality of that FCC order would constitute an improper attack on that order).

■ Applying this standard, I agree with the DTE that the FCC does treat the leasing of dark fiber as the provision of telecommunications service. In *IN THE MATTER OF APPLICATIONS FOR AUTHORITY PURSUANT TO SECTION 214 OF THE COMMUNICATIONS ACT OF 1934 TO CEASE PROVIDING DARK FIBER SERVICE,* 1993 WL 756129, 8 F.C.C.R. 2589 (F.C.C.1993) (*"Dark Fiber Order"*), the FCC was faced with a request by several BOCs that they no longer be required to provide "dark fiber service," which was defined as the "provision and maintenance of fiber optic transmission capacity between customer premises where the electronics and other equipment necessary to power or 'light' the fiber are provided by the customer, not the local exchange carrier." *Id.* 8 F.C.C.R. at 2589. *See also, Section 214 Applications to Discontinue Providing Dark Fiber Facilities,* 1991 WL 645420, 6 F.C.C.R. 5238 (1991). One of the arguments put forth by the BOCs was that the FCC lacked jurisdiction to regulate their business of leasing dark fiber because dark fiber is not itself a "service," and under the predecessor to the 1996 Act the FCC had authority to regulate only common carriers engaged in the provision of communication services. *DARK FIBER ORDER,* 1993 WL 756129, 8 F.C.C.R. at 2592. Anticipating the arguments Global Naps offers here, the BOC's

argued that in offering dark fiber for lease they were not engaging in the provision of communications service, but were in the "facility construction business," *Id.,* because dark fiber was not a service, but rather a "mere physical facility . . ., similar to a telephone pole[.]" *Id.* Although the BOCs were obviously correct in that dark fiber is not a "service" in the literal sense, the FCC found that the leasing by the BOCs of dark fiber, which is what Global Naps now seeks of Verizon, fit within the statutory definition of "wire communication," [7] which "clearly encompasses any carrier offering which permits the transmission of information between two or more points by means of electronic communications facilities, *including all instrumentalities, facilities, apparatus and services incidental to such transmission."* *Id.* 1993 WL 756129, 8 F.C.C.R. at 2593 (emphasis added). Because the leasing of dark fiber constituted the offering of a communication instrumentality, facility or apparatus, it qualified as "wire communication," and was, therefore, a form of communication service falling within the FCC's jurisdiction. *Id. DARK FIBER ORDER* was appealed to the Circuit Court for the District of Columbia, which remanded on other grounds, while leaving untouched the FCC's determination that the leasing of dark fiber constituted the provision of a communication service. *Southwestern Bell Tel. Co. v. F.C.C.,* 19 F.3d 1475 (D.C.Cir. 1994).

The FCC revisited dark fiber in 1997, in the context of a dispute over how to reconcile the 1996 Act's general prohibition

---

7. In that pre–1996 Act case, the issue was whether provision of dark fiber by the BOC's constituted "wire communication," under 47 U.S.C. § 153(a) (1993), which read, " 'Wire communication' or 'communication by wire' means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, *including all instrumentalities, facilities, apparatus,* and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." (emphasis added). The definition of "wire communication" was relocated by the 1996 Act to 47 U.S.C. § 153(52).

against the BOC's offering interLATA services, 47 U.S.C. § 271, with a later provision addressing the provision by BOCs of interLATA services to their affiliates and to other carriers, 47 U.S.C. § 272(e)(4). *In the MATTER OF IMPLEMENTATION OF THE NON–ACCOUNTING SAFEGUARDS OF SECTIONS 271 AND 272 OF THE COMMUNICATIONS ACT OF 1934, AS AMENDED*, 1997 WL 345842, 12 F.C.C.R. 8653 (1997) (*"Safeguards Order"*). One of the specific questions addressed by the FCC was whether the leasing of interLATA network capacity by BOCs constitutes the provision of interLATA communications service subject to the strictures of § 271. *Id.* 1997 WL 345842, 12 F.C.C.R. at 8682. In addressing that question, the FCC cited the leasing of dark fiber as a specific example of how the leasing of network capacity constitutes the provision of a communications service, which may not be provided by a BOC interLATA absent prior FCC approval. *Id.* 1997 WL 345842, 12 F.C.C.R. at 8682–8683 & n. 110. Although the factual circumstances differed from those in *DARK FIBER ORDER*—addressing the conditions under which BOC's are allowed to lease interLATA network capacity to their affiliates and to other carriers—the FCC relied explicitly on *DARK FIBER ORDER* for the proposition that leasing of network facilities is a communications service, *Id.* 1997 WL 345842, 12 F.C.C.R. at 8683 n. 110, thus endorsing the continuing validity of *DARK FIBER ORDER* under different factual circumstances and after enactment of the 1996 Act. *SAFEGUARDS ORDER* was reviewed by the D.C. Circuit, 131 F.3d 1044 (D.C.Cir.1997), which upheld the FCC's treatment of interLATA service provision by BOCs to their affiliates, but did not address the FCC's position that the provision of network capacity, such as dark fiber, constitutes provision of telecommunications service.

Courts faced with disputes concerning dark fiber have also relied on *Dark Fiber Order*. In *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 40 F.Supp.2d 416 (E.D.Ky.1999), the District Court for the Eastern District of Kentucky overturned the State commission and ruled that dark fiber is an unbundled network element ("UNE") that the ILEC would be obligated to make available to CLEC's under 47 U.S.C. § 251(c)(3). Although the issue of whether dark fiber is a UNE is not before me, the District Court's opinion is instructive nonetheless. The Kentucky Public Service Commission had decided that dark fiber is not a network element because it is merely an unused transmission media, with no electronics connected to it, and does not function as part of the telephone network. *Id.* at 425. Under a highly literal reading of the statute, that position would be correct, as a network element is defined as a "facility or equipment *used* in the provision of a telecommunications service," 47 U.S.C. § 153(29) (emphasis added), and dark fiber is, by definition, not "used." The court rejected that position and overturned the State commission, however, citing and deferring to the FCC's finding in *Dark Fiber Order* that dark fiber was "wire communication" under the predecessor to the 1996 Act, *Id.*, an interpretation that, as noted above, the FCC explicitly endorsed under the 1996 Act in *SAFEGUARDS ORDER*.

Likewise, in *MCI Telecomms. Corp. v. BellSouth Telecomms., Inc.*, 7 F.Supp.2d 674, 679–80 (E.D.N.C.1998), the Eastern District of North Carolina, in deciding that dark fiber is a network element, relied explicitly on the FCCs ruling in *Dark Fiber Order* that leasing dark fiber constitutes "wire communication" under the predecessor to the 1996 Act. *Id.* at 679–80.

The State commission had found that dark fiber is not a telecommunications service, and on that basis found that dark fiber is not a network element. *Id.* at 680. In overturning the State commission, the District Court found that dark fiber is a telecommunications service, *Id.* and on the basis relied upon Eighth Circuit precedent urging a broad construction of "network element" to include a range of communications services. *Id.* at 679, 680 (citing *Iowa Util. Bd. v. FCC,* 120 F.3d 753, 808 (8th Cir.1997)), *aff'd in part, rev'd in part, and remanded, AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Other district courts have endorsed the Eastern District of North Carolina's reasoning on this point. *See, MCI Telecomms. Corp. v. MI Bell Tele. Co.,* 79 F.Supp.2d 768, 783–84 (D.Mich.1999); *U.S. West. Communications, Inc. v. AT & T Communications of the Pacific Northwest,* No. C97–1320R, 1998 U.S. Dist. LEXIS 22361, at *19–20 (W.D.Wash. July 21, 1998).

Though this is not a review of the FCC's treatment of dark fiber, it may be useful to note that the FCC's position accords with the logic of the Modified Final Judgment ("MFJ") that resulted from the Justice Department's original antitrust action against the telephone monopoly. *See, U.S. v. AT & T,* 552 F.Supp. 131, 226–34 (1982). The MFJ banned BOCs from providing "interexchange telecommunications services," comparable to interLATA services under the 1996 Act, and defined "telecommunications service" as the "offering for hire of telecommunications facilities." *U.S. v. AT & T,* 552 F.Supp. at 229. Although "telecommunications facilities" were not defined, "telecommunications" were defined to include "all instrumentalities, facilities, apparatus, and services ... essential to such transmission" *Id.* It was thus clear under the MFJ that BOCs were prohibited from offering for hire interexchange (now interLATA) facilities, which is the same result that the DTE reached in its interpretation of the 1996 Act and the FCC's orders concerning dark fiber.

Based upon the foregoing, I find that the DTE was correct in determining that the FCC treats dark fiber as "wire communication" for regulatory purposes, the leasing of which constitutes the provision of a telecommunications service. I therefore uphold the DTE's finding that the leasing of dark fiber constitutes telecommunications service, which, if provided interLATA, constitutes interLATA service. The DTE thus was correct in its determination that Verizon is required by § 271 of the 1996 Act to obtain FCC approval before it leases interLATA dark cable to an ILEC such as Global Naps, and correctly denied Global Naps' complaint.

Global Naps petition for reversal and vacation of the DTE's decision is therefore denied. Judgment may be entered for defendants.