**AT & T COMMUNICATIONS OF THE SOUTH CENTRAL STATES, INC.,**
Plaintiff,

v.

**BELLSOUTH TELECOMMUNICATIONS, INC.,**
et al., Defendants.

**Civil Action No. 97–79.**

United States District Court,
E.D. Kentucky.

Sept. 9, 1998.

Thomas B. Alexander, William Barfield, Dorothy J. Chambers, Bruce F. Clark, Amy E. Dougherty, Deborah Tully Eversole, R. Douglas Lackey, BellSouth Telecommunications, Atlanta, GA, Creighton E. Mershon, Sr., BellSouth Telecommunications, Inc., Louiseville, KY, Mark R. Overstreet, Stites & Harbison, Frankfort, KY, Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hanse, Todd & Evans, P.L.L.C., Washington, DC, William L. Willis, Public Service Com'n of Kentucky, Frankfort, KY, for Defendants.

Joseph L. Famularo, Jane E. Graham, U.S. Attorney's Office, Lexington, KY, Theodore C. Hirt, U.S. Dept. of Justice, Federal Programs Branch, Civ. Div., Washington, DC, Brian G. Kennedy, U.S. Dept. of Justice, Washington, DC, for Movants.

Eric L. Ison, Greenebaum, Doll & McDonald, Louisville, KY, James P. Lamoureux, Atlanta, GA, David L. Lawson, Michael D. Warden, Sidney & Austin, Washington, DC, Holland N. McTyeire, V, Greenebaum, Doll & McDonald, Louiseville, KY, for Plaintiff.

### MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

The plaintiff, AT & T Communications of the South Central States, Inc. ("AT & T"), has filed its brief asking the Court to vacate and remand certain portions of its interconnection agreement with BellSouth Telecommunications, Inc. ("BellSouth") [Record No. 26]. The defendants, Kentucky Public Service Commission and its Commissioners ("PSC") and BellSouth, have responded [Record Nos. 30 & 31], to which AT & T has replied [Record No. 37]. Sprint Communications Company ("Sprint") and the Federal Communications Commission ("FCC") have filed *amicus curiae* briefs with the Court. This matter is now ripe for decision.

The following are the pertinent facts. The Telecommunications Act of 1996 (the "Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 151, et seq., which gives rise to this case, is intended to foster competition in all telecommunications markets. The Act permits competitive local exchange carriers ("CLECs"), such as AT & T and Sprint, to enter the local market through the following: (1) the purchase of unbundled network elements ("UNEs") from the incumbent local exchange carrier ("ILEC"); (2) the purchase of wholesale service from the ILEC for resale to the CLEC's customers; or (3) the construction of the CLEC's own facilities.

The Act requires the ILEC to negotiate interconnection agreements with new entrants to the local market. If the new entrant and the ILEC are unable to agree on terms, either party may petition the applicable state commission to arbitrate the dispute. *See* 47 U.S.C. § 252(b)(1).[1] The state commission must "conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section." § 252(b)(4)(C).

In the case at bar, AT & T, the CLEC, set the 9 month statutory clock ticking on May 6, 1996, by requesting interconnection from BellSouth, the ILEC. AT & T also petitioned the PSC for arbitration on October 11, 1996. The PSC investigated the issues raised in the petition and the response, conducted discovery, held hearings, and issued its order on the statutory deadline.

On August 13, 1997, BellSouth and AT & T filed an executed interconnection agreement. The agreement was approved by the PSC pursuant to the Act. Shortly thereafter, this lawsuit was initiated. AT & T contends that the actions of the PSC in implementing the Act violated the statute in several respects.

The broad issue before the Court is whether the executed interconnection agreement meets the requirements of the Act. *See* §§ 251–52. Additionally, because the PSC was required to apply FCC regulations, the Court must also determine whether the agreement complies with those requirements.

■ In determining whether the agreement comports with the requirements of federal law, the Court will review the legal issues surrounding compliance with the Act and the FCC regulations *de novo* and the factual issues under the arbitrary and capri-

---

1. All sections will be from Title 47 unless otherwise noted.

cious standard. *See U.S. West Communications v. Hix*, 986 F.Supp. 13, 19 (D.Colo. 1997). Determining whether an agency decision meets the arbitrary and capricious standard requires a court to consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## I. STANDARD OF REVIEW FOR THE PSC'S INTERPRETATIONS

The first question that must be addressed is whether any deference should be given to the PSC's interpretations of federal law. The PSC argues that its interpretations of federal law should be reviewed under the arbitrary and capricious standard, whereas AT & T claims that its interpretations should be reviewed *de novo.*

In determining this issue, the Court is persuaded by Judge Daniel's insightful opinion in *U.S. West Communications v. Hix*, 986 F.Supp. 13, 17 (D.Colo.1997):

> MFS, TCG and ICG argue that deference is appropriate because the state commissions, including the PUC, are given broad authority under the Act to determine compliance of the agreement with the Act, and the commissions have substantial expertise in regard to the technical matters they are called upon to decide. In other words, they argue that the state commission performs functions similar to a federal agency and thus should be given deference pursuant to the principles of *Chevron* and its progeny.... I find that even though the state commissions are given authority to interpret certain portions of the Act, *Chevron* and its progeny are not controlling. Many of the reasons why deference is given to federal agencies in those cases do not apply here. For example, deference is given [to] federal agencies because "their activities are subject to continuous congressional supervision by virtue of Congress's powers of advice and consent, appropriation, and oversight." The parties do not dispute that there is no congressional oversight of state commissions under the Act. Second, state commissions, while having experience in regulating local exchange carriers in intrastate matters, have little or no expertise in implementing federal laws and policies and do not have the nationwide perspective characteristic of a federal agency. Thus, giving deference to state commission determinations might only undermine, rather than promote, a coherent and uniform construction of federal law nationwide. Further, I find that state commissions do not have extensive experience or expertise in the specific mandate of the Act—promoting competition in the local exchange market, because of the recent passage of the Act in 1996. (internal citations omitted).

Additionally, federal courts addressing this issue have noted that it is not appropriate to defer to state agency's interpretations of federal law because fifty state commissions could apply the Telecommunications Act in fifty different ways; there would be no uniformity. *See U.S. West Communications v. TCG Seattle*, No. 97–354WD, Slip Op. (W.D.Wash. Jan. 22, 1998). Finally, to this Court's knowledge, every court that has addressed this issue has held that a state commission's interpretations of federal law are subject to *de novo* review. *See AT&T Communications of California v. Pacific Bell*, 1998 WL 246652 (N.D.Cal. May 11, 1998) (stating that "[t]he Court is aware of three federal district court decisions addressing this question; all three courts have concluded that a state PUC's interpretations of federal law are reviewed *de novo* "); *MCI Telecommunications v. Bell Atlantic–Virginia*, No. 97–CV–629, Slip Op. (E.D.Va. Dec. 24, 1997) (holding that a state agency's interpretation of federal law is subjected to *de novo* review); *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1497 (9th Cir.1997) (noting that a state agency's interpretation of federal law is reviewed *de novo* ); *Amisub v. State of Colo. DSS*, 879 F.2d 789, 795 (10th Cir.1989).

The defendants argue that *Day v. Shalala*, 23 F.3d 1052 (6th Cir.1994), where the Sixth Circuit held that a state agency's interpretations of social security regulations should be given deference, is controlling precedent for this issue. However, their reliance is misplaced because *Day* is distinguishable.

First, in *Day*, the Sixth Circuit was dealing with social security determinations. As to social security cases, the Secretary has designated state agencies to make decisions in accordance with the Social Security Act. If the claimant is dissatisfied with the state agency's decision, he may appeal the agency's decision to a federal administrative law judge. If the ALJ should rule against him, he can appeal that decision to the Secretary's Appeals Council. Hence, with social security cases, the federal agency provides oversight and guidance to the state agency via the appeals process. The *Day* court was holding that a federal district court should give a federal agency's interpretations of federal law deference, not a state agency's interpretations.

■ Under the Telecommunications Act, however, the appeal is straight from the state agency to federal court. Because there is no federal agency oversight, like in social security cases, the Court must apply a *de novo* standard of review to the agency's interpretations of the Act.

## II. UNBUNDLED NETWORK ELEMENT RATES

Moving on to the next issue, the Court will address AT & T's arguments that the PSC's decision regarding the UNE rates is unlawful. AT & T claims that the Act requires network element rates to be based on forward-looking costs, and the PSC failed to comply with this standard.

The PSC counters that there is nothing in the Act that compels a state commission to adopt a particular methodology for setting rates. Notwithstanding the above fact, the PSC asserts that BellSouth's studies were based on forward-looking costs.

In examining this issue, the Court notes that § 251(c)(3) mandates that rates be "just, reasonable, and nondiscriminatory." Contrary to AT & T's assertions, the Court finds that the PSC had sufficient information upon which to choose BellSouth's studies.

For instance, along with submitting detailed studies justifying its cost figures, BellSouth explained step-by-step how it arrived at its conclusions for each particular network element. BellSouth's expert also stated that its cost studies were based on forward-looking costs, as opposed to simply adding up the actual costs of its network.

■ The Court will not second guess the PSC's thoughtful resolution of an intensely factual issue. The PSC was within its discretion when it rejected AT & T's cost studies that were based on a perfectly efficient hypothetical model for studies that were based on BellSouth's preexisting network. The language of the Act contemplates that the touchstone of permissible pricing rules will be the actual costs an ILEC will incur in providing network elements.[2] *See* § 252(d)(1) (stating that prices "may include a reasonable profit").

AT & T has also suggested that the PSC should not have accepted BellSouth's cost studies because they were not subject to review or verification. This argument, however, lacks merit.

In fulfilling its obligations under the Act, the PSC conducted lengthy formal proceedings, culminating in two full days of hearings. Both AT & T and BellSouth presented witnesses, and the PSC received into the record substantial evidence from both sides on the appropriate method for determining the costs of unbundled network elements.[3] BellSouth also provided its cost-study witness, and she was extensively cross-examined by AT & T's counsel.

As to AT & T's Hatfield model, it was found to have numerous problems with its assumptions. The PSC did, however, use AT & T's model as an independent check on the reasonableness of BellSouth's studies. The PSC also reviewed the studies, analyzed the data, and applied adjustments when it concluded that they were necessary.

2. AT & T has also argued that the PSC reversed its position on the issue of whether to use forward-looking prices and claims that its actions bear no relation to its words. The Court finds that this argument lacks merit.

3. BellSouth also provided an enormous amount of backup documentation to support its conclusions.

AT & T's claim that the PSC failed to investigate the assumptions underlying Bell-South's studies is meritless. The PSC's conclusion that BellSouth's studies more closely reflected actual total element long-run incremental cost ("TELRIC") studies than did AT & T's vigorously espoused Hatfield model justified its adoption of the studies as the primary basis for its eventual pricing decisions.

AT & T also charges that it was denied an opportunity to respond to the vast majority of BellSouth's TELRIC studies and that the PSC did not investigate the assumptions underlying BellSouth's cost studies. The Court, however, disagrees with AT & T's claims.

During oral arguments, the PSC made clear that it had extensively reviewed AT & T and BellSouth's models. Even though it chose to go with BellSouth's model, the PSC found that BellSouth's model had some problems and ordered it to submit additional cost studies. The fact that the PSC did not allow AT & T to respond to BellSouth's additional studies is irrelevant because the PSC had already decided which model it was going to choose.

■ After receiving BellSouth's additional cost studies, the PSC's earlier concerns regarding the interim rates subsided, and the PSC decided to make the interim rates the permanent rates. Based on the statutory time pressure and the plethora of information before it, the PSC's decision was reasonable.[4]

If the PSC had of granted AT & T's request to establish an additional docket with a full procedural schedule to reconsider arbitrated issues after the statutory deadline had expired, the PSC would have violated the Telecommunications Act. See 47 U.S.C. § 252(e)(4) (stating that if the commission does not act within 90 days on a negotiated agreement or 30 days on an arbitrated agreement, the agreement is deemed approved); 47 U.S.C. § 252(e)(5) (stating that if a state commission fails to appropriately act in any manner under section 252, the FCC is in-

structed to preempt and deal with the matter itself). When it comes to the PSC carrying out its duties, time is clearly of the essence. See GTE North, Inc. v. McCarty, 978 F.Supp. 827, 831 (N.D.Ind.1997) (stating that the Act was "designed to foster the rapid development of competition in the local telephone services market"). Because AT & T did not move for an additional proceeding until May 29, 1997, which was over three months after the statutory deadline had expired, the PSC properly denied AT & T's request for more proceedings.

Finally, on this point, section 252(b)(4)(B) states the following:

> The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues.

The Court finds that requiring the PSC to conduct more hearings and entertain more arguments would undermine the clear intention of Congress to encourage the rapid deployment of new technology through competition and reduced regulation.

### III. OPERATOR SERVICES AND DIRECTORY ASSISTANCE PLATFORMS

AT & T further claims that the agreement violates the Act and binding FCC regulations by failing to require BellSouth to provide customized routing from AT & T's resale customers to AT & T's operator services and director assistance platforms ("OS/DA"). This is another issue that must be reviewed de novo because AT & T claims that the PSC found that the Act did not require BellSouth to separate its OS/DA from its resold local exchange service.

When a BellSouth local telephone customer dials "0" in connection with an operator assisted call, or "411" for directory assistance, BellSouth's local switch (essentially a large computer) routes that call to Bell-South's OS/DA platform where the call is handled by BellSouth's operators. AT & T claims that the FCC's binding rules require ILECs to separate OS/DA from resold ser-

---

4. AT & T's opportunities were limited only by its failure to present pertinent evidence within the

strict time limits on state arbitration proceedings.

vices to the extent technically feasible and to route OS/DA calls from entrants' resale customers to entrants' OS/DA platforms.

AT & T, however, states that the agreement exempts BellSouth from this obligation by failing to require BellSouth to separate OS/DA platforms. AT & T argues that this exemption was not based on a finding of technical infeasibility, but rather the PSC's erroneous belief that the Act does not require BellSouth to separate its OS/DA from resold local exchange service.

BellSouth counters that an ILEC's duty under the Act is to make available for resale "any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers...." § 251(c)(4)(A). Hence, because local exchange service without operator services is not provided by BellSouth to subscribers who are not telecommunications providers, the Act does not require it to offer this to AT & T.

Additionally, BellSouth claims that AT & T rests its entire argument on a single sentence in the *Local Competition Order:* "We therefore find that incumbent LECs must unbundle the facilities and functionalities providing operator services and directory assistance from resold services and other unbundled network elements to the extent technically feasible."

BellSouth, however, emphasizes that context is extremely important and points out that the FCC was discussing the requirement to unbundle the OS/DA services from other elements and from the complete service that otherwise would have been made available for resale. BellSouth notes that the FCC does not state that the local switch minus OS/DA functionality must itself be made available for resale.

In fact, BellSouth points out that the FCC has stated just the opposite: "The 1996 Act does not require an incumbent LEC to make a wholesale offering of any service that the incumbent LEC does not offer to resale customers."[5] BellSouth asserts that the PSC properly rejected AT & T's effort to require

BellSouth to make available for resale a service that it does not offer to its retail customers, i.e. local switching without OS/DA functionality. BellSouth notes that AT & T is free to purchase the local switching capacity as separate and unbundled from the OS/DA functionality, but it cannot purchase for resale a telecommunications service that BellSouth does not offer at retail.

AT & T counters that the general statement contained in paragraph 872 cannot override the FCC's more specific mandate that an ILEC must separate these services from its resold local exchange service. Moreover, AT & T points out that the PSC contradicts BellSouth by conceding that the *Local Competition Order* requires ILECs to separate OS/DA from resold local service to the extent technically feasible.

The first issue to be addressed is whether the FCC has interpreted the Act to require BellSouth to unbundle its OS/DA from its resold services and provide this to AT & T. When viewing the context of the FCC's statements on this point, the Court finds that the most reasonable interpretation is that the FCC does not require an ILEC to unbundle its OS/DA from its resold services when it does not provide this for itself.[6]

■ AT & T has simply confused the distinction between resale and access to unbundled network elements: while BellSouth may be obligated to unbundle the local switching element from the OS/DA platform, it has no obligation to provide its local exchange service for resale in any manner other than in the way it provides this service to its own customers. *See* § 251(c)(4). In essence, AT & T is asking BellSouth to provide a completely new service. However, because BellSouth does not currently provide local telephone service without OS/DA, AT & T is not entitled to obtain such a package through resale.

■ Even if, however, AT & T and the PSC are correct that the FCC has interpreted the Act to require BellSouth to unbundle OS/DA from resold local exchange where

---

**5.** *See Local Competition Order* at 15934, para 872.

**6.** In other words, the Court agrees with Bell-South's position on this issue.

feasible, an issue arises at to whether customized routing is technically feasible. In AT & T's reply brief,[7] it states the following:

> Nonetheless the PSC argues that Bell-South should not be required to provide customized routing from AT & T's resale customers to AT & T's OS/DA platforms because "the PSC determined that selective routing is not technically feasible in the resale environment." PSC Br. at 32. But the PSC never concluded that customized routing is technically infeasible in the resale context.

AT & T, however, conceded during oral arguments that for all intents and purposes customized routing and selective routing were the same. Hence, it was well within the PSC's discretion to make the infeasibility finding.

The PSC's decision as to the technical infeasibility of selective routing was based on the following: (1) the finite number of line class codes; and (2) the adverse consequences to telecommunications in Kentucky as a result of exhaustion of the switch.[8] Based on the information before it, the Court finds that the PSC did not abuse its discretion.

## IV. BELLSOUTH'S OBLIGATION TO PAY FOR DEVELOPMENT OF OSS

AT & T's last argument is that the agreement violates the Act and FCC regulations by requiring new entrants, but not BellSouth, to pay the costs of electronic interface development for operations support systems. Operations support systems ("OSS") are critical elements of an incumbent's network. Among other things, they include the computer systems that BellSouth uses to take customer orders, monitor facilities for maintenance and repair, respond to customer inquiries, and track customer usage for billing purposes. Because these systems determine the speed and efficiency with which ILECs can market and maintain telecommunications services and facilities, the FCC found that providing nondiscriminatory access to these support systems is vital to create opportunities for competition. *See Local Competition Order* paras. 516, 518.

Electronic interfaces are the means by which new entrants obtain such access. AT & T claims that the PSC violated the Act and binding FCC regulations when it determined that new entrants must pay not only their own costs incurred in modifying their networks but that they should also bear Bell-South's costs of interface development.

Section 41 of the agreement states that "[a]ll costs incurred by BellSouth to implement operation interfaces shall be recovered from the [new entrants] on a fairly apportioned basis." Because the Act requires ILECs to provide access to unbundled network elements on terms that are nondiscriminatory, AT & T asserts that section 41 of the agreement violates the Act. In other words, because costs are imposed on new entrants that are not imposed on BellSouth, AT & T argues that the PSC's decision is discriminatory.[9]

The PSC counters by pointing out that AT & T is complaining because it must pay for systems that will enable it to interface with BellSouth's operating systems. The PSC claims that this is a meritless complaint and states that there is nothing in the law that supports AT & T's position. The Court agrees with the PSC's position.

The FCC regulations only state that ILECs must cooperate with competitors and make available access to their OSS, but FCC regulations do not state that access to an ILEC's OSS must be subsidized by the ILEC. The PSC correctly notes that "[o]ne would not argue he was denied access to a concert on the basis that he was required first to buy a ticket." *See* Record No. 30, p. 36. Because the electronic interfaces will only benefit the CLECs, the ILECs, like BellSouth, should not have to subsidize them. BellSouth has satisfied the nondiscrimination prong by providing access to network elements that is substantially equivalent to the

---

7. AT & T's Reply Brief, p. 22.

8. *See* PSC's Brief, pp. 32–33.

9. In its *amicus curiae* brief, Sprint echoes AT & T's arguments.

access provided for itself. AT & T is the cost causer, and it should be the one bearing all the costs; there is absolutely nothing discriminatory about this concept. Accordingly,

**IT IS ORDERED** that the rulings of the PSC be, and the same hereby are, **AFFIRMED.**