MCI TELECOMMUNICATIONS CORP. and MCIMetro Access Transmission Services, Inc., Plaintiffs,

v.

BELLSOUTH TELECOMMUNICA-TIONS, INC., Kentucky Public Service Commission, and Linda Breathitt, Edward J. Holmes, B.J. Helton, in their Official Capacities as Commissioner of the Kentucky Public Service Commission, Defendants.

No. Civ.A. 97–76.

United States District Court, E.D. Kentucky.

March 11, 1999.

Henry S. Alford, C. Hatfield, Middleton & Reutlinger, Louisville, KY, Michelle B. Goodman, Jenner & Block, Washington, DC, for MCI Telecommunications Corporation, MCIMetro Access Transmission Services, Inc., plaintiffs.

Mark R. Overstreet, Bruce F. Clark, Stites & Harbison, Frankfort, KY, Dorothy J. Chambers, Creighton E. Mershon, Sr., BellSouth Telecommunications, Inc., Louisville, KY, Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hanse, Todd & Evans, P.L.L.C., Washington, DC, William Barfield, R. Douglas Lackey, Thomas B. Alexander, BellSouth Telecommunications, Atlanta, GA, for BellSouth Telecommunications, Inc., defendant.

Deborah Tully Eversole, Amy E. Dougherty, William L. Willis, Public Service Commission of Kentucky, Frankfort, KY, for Kentucky Public Service Commission, Linda Breathitt, Edward J. Holmes, B.J. Helton, defendants.

### MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This matter is before the Court on a challenge by Plaintiffs MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc. (collectively "MCI") of several aspects of an agreement between Plaintiffs and Defendant Bell-South Telecommunications, Inc. (hereinaf-

ter "BellSouth"). Said agreement was arbitrated by Defendant Kentucky Public Service Commission (hereinafter "PSC") pursuant to the local competition provisions of the Telecommunications Act of 1996, Pub.L. No. 104–401, 110 Stat. 56 (hereinafter the "Act" or "1996 Act"). Greatly dissatisfied with the outcome of said arbitration, MCI appears before this Court seeking relief.

MCI alleges that BellSouth failed to comply with the Act in that BellSouth continues to reap monopoly profits while preventing competitors such as MCI from effectively competing in local markets. Furthermore, MCI alleges that during arbitration, the PSC incorrectly interpreted the Act which resulted in an unfavorable decision against MCI in multiple portions of the agreement.

All parties to the above-styled action have filed briefs with this Court addressing the merits of their respective positions. On January 27, 1999, oral arguments were held before this Court. The parties were then given the opportunity to file supplemental briefs in support of their respective positions due to the fact that two days prior to oral arguments, the United States Supreme Court rendered an opinion in *At & T Corp. v. Iowa Utilities Bd.*, —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), which concerns the 1996 Telecommunications Act. This Court has now been sufficiently advised and reaches the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The above-styled action turns on the interpretation of several provisions of the 1996 Telecommunications Act. Said Act was enacted for the purpose of opening up full and effective market competition for both local and long distance telephone service. In creating the Act, Congress recognized that new entrants into a telecommunications area would be disadvantaged when pitted against a long dominating incumbent local exchange carrier (hereinafter "ILEC").

Under the Act, Congress set forth three methods to facilitate entry into the market. The first method allows a new entrant to interconnect directly or indirectly with the facilities and the equipment of the ILEC, thus enabling a customer of the new entrant to make and receive calls from the ILEC's customers. *See* 47 U.S.C. § 251(a)(1). The second method of entry permits new entrants to purchase their retail services at wholesale rates so that new entrants can compete by reselling these services under a different brand to retail customers. Finally, Congress provided new entrants with a method whereby they may lease on an element by element basis, portions of the ILEC's existing local network.

Under the Act, new entrants are to request and negotiate interconnection from an ILEC. If the ILEC and the new entrant cannot agree on the terms in which the new entrant enters the market, the state utility commission has the authority to arbitrate under federal law all disputed issues. If the state public utility commission is unable to perform this duty, the Federal Communications Commission is to step in and arbitrate the matter. The arbitration process results in an interconnection agreement incorporating both negotiated and adjudicated terms. Said agreement must be finalized within nine months from the time a new entrant first requests negotiations. *See* 47 U.S.C. § 252(b)(4)(C).

In the case at bar, MCI first requested interconnection from BellSouth, an ILEC, on March 26, 1996. Said parties could not agree on the manner of market entry and the PSC was petitioned for arbitration by MCI on September 3, 1996. According to the nine month rule, the PSC was required to make a final determination on all issues by December 26, 1996.

The PSC investigated the issues raised in MCI's petition and BellSouth's response, including the key issues of costs and rates. It also conducted discovery,

held hearings on November 7 and 8, 1996, and issued an order on December 20, 1996. In the PSC's order, BellSouth was required to file studies of certain discrete costs which were not in the record so that final rates on those few items could be set pursuant to principles described in the order. Additionally, MCI and BellSouth were ordered to file their interconnection agreement within sixty days.

Instead of filing the interconnection agreement within the deadline set by the PSC, the parties filed with the PSC petitions for reconsideration and clarification. In addition, MCI asked for an establishment of a separate, additional docket to consider costs and rates, which are essential terms of an interconnection agreement. Because the appropriate methodology to determine those rates had already been decided, the PSC refused to establish an additional docket.

In an attempt to work out an interconnection agreement, the PSC entertained an additional list of issues filed by MCI on February 24, 1997, and made determinations regarding additional disputes between the parties. However, the PSC refused to establish an additional docket to reconsider costs and rates for interconnection. The PSC did set a hearing for June 10, 1997 to consider additional cost studies filed by BellSouth as required by the December 20, 1996. To encourage settlement, the PSC scheduled an informal conference to clarify costs issues and expedite final matters.[1]

At the informal conference, MCI was unprepared to discuss the specific cost issues which were the subject at hand, and asked for additional time in which to discuss and present same. Again, MCI requested that an additional docket begin from ground zero to reevaluate BellSouth's costs upon which interconnection rates were to be based.

Determining that MCI had no interest in a meaningful participation in any procedure short of an additional full-blown cost docket to review interconnection rates, the PSC canceled its June 10, 1999 hearing and set final interconnection rates based on methodologies it had determined pursuant to evidence presented during the statutory time frame. On June 4, 1997, MCI once again requested an additional docket to reevaluate BellSouth's costs. Said request was denied by the PSC and the parties were ordered to finalize and submit their agreement.

On August 4, 1997, MCI filed a motion for a rehearing and reconsideration based on deprivation of its constitutional right to due process. Said motion was eventually denied by the PSC.[2] Finally, on August 13, 1997, MCI and BellSouth filed an executed interconnection agreement which was approved by the PSC pursuant to 47 U.S.C. § 252(e)(4).

Seeking relief from what it saw as a violation of the 1996 Telecommunications Act, MCI filed a complaint before this Court on September 22, 1997.

## CONCLUSIONS OF LAW

In the aforementioned complaint, MCI presents six issues for resolution by this Court.

### I. Calculation of Interconnection Rates

When forming the interconnection agreement, the new entrant and the ILEC must determine the value at which the telecommunication infrastructure is transferred to the new entrant. 47 U.S.C. § 251(c)(3) requires the ILEC to provide to new entrants "nondiscriminatory access to network elements" in an unbundled form and in a manner that allows the new entrants to combine such elements in or-

---

1. AT & T was invited to attend this informal conference due to the fact that it, too, was negotiating an interconnection agreement with BellSouth.

2. AT & T filed a similar claim of denial of due process.

der to provide telecommunications service. This means that the ILEC sells or leases to the new entrant, equipment and supporting services at separate prices in a manner that allows the new entrant to provide services to telephone customers. *See AT & T Corp. v. Iowa Utilities Bd.,* —— U.S. ——, ——, 119 S.Ct. 721, 737, 142 L.Ed.2d 835 (1999).

Pursuant to 47 U.S.C. § 252(c), the PSC has the authority during arbitration to "establish any rates of interconnection, services, or network elements" at issue between the parties. Said rates must be "just and reasonable." *See id.* at § 252(d)(1). The PSC shall base these rates on the cost expended by the ILEC in establishing these network elements, and may include a reasonable profit earned by the ILEC. *Id; See also* 47 C.F.R. § 51.505(a). Said cost must be "determined without reference to a rate-of-return or other rate-based proceeding" and instead should be a forward-looking economic cost. 47 U.S.C. § 252(d)(1)(A). This total element long run incremental cost (hereinafter "TELRIC") of an unbundled network element is the "forward looking cost over the long run of the total quantity of the facilities and functions that are directly attributable to, or reasonably identifiable as incremental to" that element. 47 C.F.R. § 51.505(b).

MCI argues that the PSC failed to properly calculate the rate at which BellSouth could charge for each unbundled network element (hereinafter "UNE"). These rates, according to MCI, are based on BellSouth's existing network configuration and embedded technology. Instead of using TELRIC pricing to figure the "cost of

operating a hypothetical network built with the most efficient technology available"[3] as a base rate, MCI argues that the PSC figured into the rate BellSouth's bloated, inefficient infrastructure so BellSouth could undercut new competitors' prices in the short term in an attempt to retain its monopolistic grip on the market.

According to the record, both MCI and BellSouth were given an opportunity to submit pricing schemes to the PSC. MCI's rates were based on the "Hatfield model", a computer model that has generated much criticism for failing to take into account the reasonable costs facing ILECs.[4] In *AT & T Comm. of South Cent. States, Inc. v. BellSouth Telecomm., Inc.,* 20 F.Supp.2d 1097 (E.D.Ky.1998), a case strikingly similar to the one at bar, this Court noted that the Hatfield model was recognized as having numerous problems with its assumptions. BellSouth presented to the PSC a pricing scheme based on a nine-step analysis which the PSC has described as reflecting the concrete reality of operating its local exchange network.

Although the PSC relied for the most part on BellSouth's model to set the interconnection rates, the PSC states that it did not take BellSouth's rates at face value. Instead, the PSC adjusted BellSouth's rates largely through use of the Hatfield model and used the Hatfield model as an independent estimate to check the reasonableness of BellSouth's estimates. The PSC concluded that BellSouth's studies, particularly as adjusted, more closely reflected actual TELRIC costs than did the Hatfield model.

**3.** *AT & T,* —— U.S. ——, 119 S.Ct. 721, n. 3, 142 L.Ed.2d 835 (defining the elements to be used in TELRIC pricing).

**4.** Many PSCs in other states have held that the Hatfield model is unreliable and suffers from design flaws. *See e.g.,* Opinion and Order, *Petition of MCImetro Access Transmission Servs., Inc. for Arbitration of Its Interconnection Request to Bell Atlantic–PA, Inc.,* 1996 Pa. PUC LEXIS 169, at *18 (Pa. PUC Dec. 20,

1996); Order, *Consolidated Petitions of NYNEX, Teleport Comm. Group, Inc., etc, Pursuant to § 252(b) of Telecommunications Act of 1996,* D.P.U. 96–73/74—Phase 4, § IV.B.2 (Mass. Dept. of Pub. Utils. Dec. 4, 1996); Arbitration Order, *AT & T Comm. of the Southwest, Inc. Petition for Arbitration with Southwestern Bell Tel. Co.,* No. TO–97–40, § II, 1 (Mo. PSC Dec. 11, 1996).

■ This Court will review *de novo* whether the PSC set the rates in the case at bar in a manner that violated the 1996 Act.[5] The facts before this Court on the pricing issue are almost identical to those in *AT & T Comm. of South Central States, Inc. v. BellSouth Telecomm., Inc.,* 20 F.Supp.2d 1097 (E.D.Ky.1998). In *AT & T,* said party presented a pricing scheme based on the Hatfield model and BellSouth presented the same cost studies as it did in the case at bar. The PSC rejected AT & T's cost studies due to the numerous problems that accompanied the Hatfield model. However, the PSC used AT & T's model "as an independent check on the reasonableness of BellSouth's studies." *Id.* at 1101. This Court held that the PSC was "within its discretion when it rejected" the Hatfield model. *Id.*

■ As this Court has previously held, the "thoughtful resolution of an intensely factual issue" by the PSC will not be second guessed by this Court. *Id.* After MCI's request for arbitration on September 3, 1996, the PSC investigated the key issues of costs and rates, conducted discovery on the issues, and held hearings for two days in November of 1996. On December 20, 1996, the PSC issued a ruling on same. MCI repeatedly demanded that the PSC establish a separate additional docket to reconsider costs and rates. Said requests were denied. However, the PSC did set a hearing on June 10, 1997 to consider additional cost studies filed by BellSouth in response to the December 20, 1996 Order. At an informal conference held prior to the June 10th hearing, MCI was not prepared to discuss the specific costs issues with the PSC and instead asked that the hearing be canceled to give MCI additional time to prepare. Again MCI asked for an additional docket to reevaluate BellSouth's costs upon which interconnection rates were to be based.

The PSC felt that MCI had shown no interest in any type of meaningful participation in any procedure short of an entirely separate docket to reevaluate BellSouth's cost studies. Therefore, the PSC canceled the June 10, 1997 hearing and set final rates based on methodologies it had determined pursuant to evidence presented during the statutory time frame of March 1996 to December 1996.

■ Upon review of the record, this Court determines that the rates set by the PSC, which were based on BellSouth's cost studies in comparison with those presented by MCI, are indeed forward looking and comply with the 1996 Act. The Court will uphold as reasonable the PSC's conclusion that BellSouth's cost studies more closely reflected actual TELRIC costs than did the Hatfield model. The interconnection rates set by the PSC will not be disturbed by this Court.

■ Related to the issue of cost studies, MCI argues that the PSC's refusal to allow MCI an opportunity to present objections to the cost studies filed by BellSouth and used by the PSC to set the rates included in the interconnection agreement was a violation of MCI's Fourteenth Amendment right to due process.[6]

■ "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "The fundamental

---

5. The Court notes that every court that has addressed the issue of whether an interpretation of federal law by a state commission such as the PSC should be given deference by a federal court has held that the commission's interpretations should be subject to *de novo* review. *See e.g. AT & T,* 20 F.Supp.2d at 1100; *AT & T Comm. of California v. Pacific–Bell,* 1998 WL 246652 (N.D.Cal. May 11, 1998).

6. MCI is entitled to assert a due process claim because it has an entitlement to the proper setting of telecommunication rates. *See MCI Telecomm. v. BellSouth Telecomm.,* 9 F.Supp.2d 766, 772 (E.D.Ky.1998) (holding that a carrier has a property interest in telecommunication rates and therefore is entitled to due process in the calculation of said rates).

requirement of due process is the opportunity to be heard 'at a meaningful time in a meaningful manner.' " *Mathews v. Eldrige*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). In determining the merit of MCI's due process claim, the Court will apply three factors. First, the Court will look at "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. Next, the Court will evaluate "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Id.* Finally, the Court will look at the agency's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*

At the time the PSC became involved in assisting the parties in forming the interconnection agreement, there were approximately three and a half months remaining in the nine-month rule. The PSC did an investigation, conducted discovery, and held hearings before it issued an order. The Court notes that both MCI and Bell-South participated in the submission of cost studies to the PSC and in the two-day hearings. After the December 20, 1996 order was issued and while the parties were finalizing their agreement, the PSC entertained motions from the parties and scheduled a hearing to consider additional cost studies which BellSouth was required to file pursuant to the aforementioned order.[7] That hearing was canceled due to MCI's lack of meaningful interest in participating in any procedure short of an additional full-blown cost docket to review the interconnection rates. Said lack of interest is obvious from MCI's multiple requests for an additional docket and petitions for reconsideration. Moreover, at an informal conference set prior to the hearing, MCI was unprepared to discuss the specific cost issues and requested that the PSC start from ground zero in reevaluating BellSouth's costs upon which the interconnection rates were to be based.

■ In balancing the three interests formulated in *Mathews* against the statutory time frame set forth in the Act, this Court finds that the PSC did not violate MCI's due process rights. To reiterate a conclusion reached by this Court in *AT & T*, "requiring the PSC to conduct more hearings and entertain more arguments would undermine the clear intention of Congress to encourage the rapid deployment of new technology through competition and reduced regulation." *AT & T*, 20 F.Supp.2d at 1102. Based on the circumstances before the PSC, MCI was provided with adequate procedural protections as the situation demanded. *See Morrissey*, 408 U.S. at 481, 92 S.Ct. 2593.

MCI also takes issue with the PSC's refusal to geographically deaverage network element rates during its calculation. The concept of deaveraging establishes separate rates for different population density zones. MCI argues that the PSC should have computed the rates to reflect the geographic cost differences of providing network elements to MCI's new customers and required BellSouth to resell those services accordingly.[8]

MCI basically argues that the PSC's failure to deaverage rates results in MCI paying prices for network elements that are wholly divorced from the forward-looking economic cost of providing those elements. According to MCI, the refusal to deaverage is contrary to the 1996 Act.

The PSC interpreted the Act to be silent on the issue of deaveraging. As a result, the PSC states that it carefully balanced

---

7. The PSC heard motions for an additional six months after it issued its December 20, 1996 order in an effort to assist the parties in finalizing their agreement.

8. MCI notes that BellSouth's cost studies indicate that the deaveraged rate in urban areas would be 51 percent lower than the deaveraged rate in rural areas.

universal service goals with the Act's mandate of fostering the rapid development of competition when establishing the cost-based UNE rates. It defends its decision not to deaverage at this early stage of competition by relying on the need to serve all customers and the fact that the Act explicitly provides that a company's rates to subscribers in rural and high cost areas may be no higher than its rates charged to urban subscribers. *See* 47 U.S.C. § 254(g). The PSC does not dispute the fact that deaveraging will occur in the future; however, such action is not feasible at this point in time.

 This Court agrees with the PSC that the Act appears to be silent on the issue of deaveraging. Therefore, the Court will focus on whether the PSC's refusal to consider deaveraging the cost of the UNEs is a violation of the spirit of the Act. The purpose of the Act is to create a vibrant competitive market that will bring lower prices and better service to consumers. A review of the legislative history indicates that the Act's objectives are to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and to encourage the rapid development of new telecommunications technologies." H.Rep. No. 104–204, 1 (July 24, 1995). In an effort to foster telecommunications growth and development in rural and high cost areas, the federal government subsidizes some of the universal service costs incurred by a telecommunications carrier. *See* 47 U.S.C. § 254(b), (d).

 The Court is aware from the cost studies provided by BellSouth that the expenses of providing local service varies with the density of the population. The Court is also aware that should the PSC geographically deaverage the cost of providing service to customers, the possibility exists that new entrants would only purchase UNEs in urban areas or other low cost segments of the industry. By purchasing UNEs in this manner, a new entrant could obtain the advantages of serving low overhead areas immediately without dealing with the need to subsidize the more expensive areas. The Court recognizes that remote rural areas which are less densely populated are not terribly attractive to new market entrants. However, their need for service at a reasonable rate is no less important than the need in booming urban areas. It is the opinion of this Court that the PSC's refusal to deaverage was an effort to prevent new entrants from seeking the lowest possible overhead to serve the most lucrative customers. The PSC must remain focused on the long term interests of the citizens of Kentucky. Therefore, the decision of the PSC to balance universal service goals with the purpose of the Act by refusing to deaverage the UNE rates was lawful.

## II. Dark Fiber Usage

MCI alleges that the PSC discriminated against it in its ruling on the use of a UNE known as dark fiber, an unused fiber optic cable between switches in BellSouth's network. Said fiber is dark in the sense that the carrier has chosen not to provide the electronic equipment needed to power or "light" it.

The PSC ruled that BellSouth did not have to provide MCI with the opportunity to lease dark fiber if BellSouth had a legitimate business purpose for the fiber. Said purpose required use of the fiber within three years. If BellSouth did lease the dark fiber to MCI, MCI was required to make use of the fiber within six months or lose the lease. MCI claims that the two different time frames for the parties is discriminatory.

According to the PSC's ruling, anytime that MCI requests dark fiber, BellSouth is required to demonstrate on a case by case basis that BellSouth needs the fiber for its own use. The PSC felt that is was not unreasonable to permit BellSouth, the company that laid the fiber, to use it rath-

er than sell it if it can demonstrate the need for it.

The issue of dark fiber is one of first impression for this Court. At this point in time, there is no binding precedent on whether or not dark fiber is indeed a UNE. However, several district court decisions discussed forthwith provide excellent guidance to this Court.

To begin this analysis, the Court will define dark fiber as a fiber optic cable which is used to transmit telecommunications after it becomes lit. The PSC has referred to it as unused transmission media and states that it is not a UNE because it has no electronics connected to it and does not function as part of the telephone network. Therefore, the PSC held that it does not contribute to a carrier's provision of service until after the carrier decides to electronically connect it to the existing lit optic fibers.

This Court disagrees with the PSC and finds that dark fiber is indeed a UNE. The FCC has held that dark fiber is "wire communication" under the predecessor to the 1996 Act. *In re Applications for Authority Pursuant to Section 214 of the Communications Act of 1934 to Cease Providing Dark Fiber Service*, 8 F.C.C.R. 2589 (F.C.C.1993), *remanded on other grounds, Southwestern Bell Tel. Co. v. F.C.C.*, 19 F.3d 1475 (D.C.Cir.1994). This Court finds that dark fiber is a UNE because it is in the ground ready to go and in some cases wrapped around lit fibers that are classified as UNEs. Dark fiber in the ground is "less like inventory and more like a network element; that is, a 'facility or equipment used in the provision of a telecommunications service.'" *MCI v. Bell–Atlantic*, 36 F.Supp.2d 419, 423 (D.D.C.1999) (quoting 47 U.S.C. § 251(c)(3)). Similarly, *U.S. West Comm., Inc. v. AT & T Comm. of the Pacific Northwest, Inc.*, 31 F.Supp.2d 839 (D.Or. 1998) has held that the ready-to-use quality of dark fiber coupled with sufficient evidence to support a new entrant's material impairment to the ability to properly

interconnect without dark fiber indicates that said fiber is a UNE. *Id.* at 854; *See also MCI Telecomm. v. BellSouth Telecomm.*, 7 F.Supp.2d 674, 679–80 (E.D.N.C. 1998).

Upon *de novo* review, this Court concludes that dark fiber is a UNE. According to 47 U.S.C. § 251(d)(2) and § 251(c)(3), BellSouth must provide MCI with nondiscriminatory access to BellSouth's dark fiber if failure to provide such access would impair MCI's ability to provide the telecommunication service it seeks to offer to its customers. *See MCI Telecomm.*, 7 F.Supp.2d at 680. The PSC states that even if this Court concludes that dark fiber is a UNE, its decision need not be overturned because MCI's ability to provide service would not be impaired. This Court is not convinced that MCI would not be impaired under the dark fiber scheme established during arbitration and therefore remands this issue to the PSC. The Court notes that the PSC's decision to require MCI to use any dark fiber leased from BellSouth within six months is reasonable as it ensures that dark fiber is allocated first to those carriers with the greatest need. However, permitting BellSouth to retain dark fiber for three years before lighting it, even if BellSouth has legitimate business decision, seems to be unreasonably restrictive on all new entrants.

## III. Short Term Promotions and Contract Service Arrangements

The third issue MCI presents to this Court is two-fold. First, MCI alleges that BellSouth's exclusion of all short-term promotions from resale at a discount rate, an action permitted by the PSC, is contrary to the 1996 Act and FCC regulations. MCI states that the PSC's decision that BellSouth's short-term promotions, which are promotions that last for a period of 90 days or less, are not subject to resale hinders MCI's ability to compete through the resale process envisioned in 47 U.S.C. § 254.

■ This Court determines *de novo*, that the PSC incorrectly ruled on this issue. The PSC's decision was much like that of the North Carolina Utilities Commission in *MCI Telecommunications* previously discussed by this Court. *MCI Telecomm.*, 7 F.Supp.2d 674. Both state commissions seem to have been under the impression that short-term promotions do not have to be made available to new entrants. This notion is clearly wrong. What the FCC has said is that an ILEC does not have to offer to the new entrants short term promotions at a discount rate. Instead, the ILEC "shall apply the wholesale discount rate to the ordinary rate for a retail service" only if "such promotions involve rates that will be in effect for no more than 90 days;" and the ILEC does not attempt to use the short term promotions as an attempt to evade other obligations under the Act. 47 C.F.R. § 51.613(a)(2); *See MCI Telecomm*, 7 F.Supp.2d at 682–83. An ILEC who refuses to market short-term promotions to a new entrant is in violation of § 251(c)(4). Therefore, the PSC's decision to exclude from resale all short term promotions offered by BellSouth is overturned.

Second in this issue is whether the PSC's failure to require BellSouth to sell contract service arrangements (hereinafter "CSAs") to MCI at the wholesale rate violates the plain language of the Act and FCC regulations. CSAs are "contractual agreements made between a carrier and a specific, typically high volume customer, tailored to that customer's individual needs." *AT & T Comm. of Southern States v. BellSouth Telecomm.*, 7 F.Supp.2d 661, 671 (E.D.N.C.1998) (internal cites omitted). This Court need not reach a conclusion on this matter as BellSouth has informed the Court that it is now willing to sell CSAs to MCI at a wholesale rate.[9] Therefore, this issue is remanded to the PSC to determine the appropriate wholesale rate for CSAs to be sold by BellSouth to MCI.

## IV. Customized Routing for Resale Customers

MCI disagrees with the PSC's decision to allow BellSouth to refuse to provide customized routing to new entrants providing service through resale. Customized routing would have meant that an MCI customer's call would be automatically routed to an MCI operator for operator service and directory assistance (hereinafter "OS/DA"), rather than to a BellSouth operator. Because this Court is making a determination as to whether the PSC's ruling on this issue is contrary to federal law, a *de novo* review is required.

MCI argues that the Act requires BellSouth to unbundle its OS/DA services from its resold local exchange service and offer them to new entrants to the extent it is technically feasible. BellSouth relies on 47 U.S.C. § 251(c)(4)(A) which states than an ILEC's duty under the Act is to make available for resale "any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers...." Because local exchange service without operator service is not provided by BellSouth to subscribers who are not telecommunication providers, BellSouth argues that the Act does not require it to offer unbundled OS/DA service to MCI.

■ This exact issue appeared before the Court in *AT & T Comm. of the South Cen. States, Inc. v. BellSouth Comm., Inc.*, 20 F.Supp.2d 1097 (E.D.Ky.1998). It is this Court's ruling that the "FCC does not require an ILEC to unbundle its OS/DA from its resold services when it does not provide this for itself". *Id.* at 1103. By requiring BellSouth to unbundle its OS/DA from its service package sold to its own

---

**9.** This change of heart by BellSouth came after the FCC made clear that it disagreed with the PSC and other state commissions on this issue. The FCC informed BellSouth that it would not grant BellSouth the authority to provide long distance service originating in any state in which it provides local service if such CSA restrictions exist in that state.

customers, the Court would be forcing BellSouth to provide for resale to MCI, a package that BellSouth does not even offer to its own customers. *See id.* This requirement would be contrary to § 251(c)(4). Therefore, on the issue of customized routing, the PSC's decision will be upheld.

## V. Access to Customer Service Records

MCI challenges the PSC's decisions regarding the manner in which it must obtain from BellSouth customer service records and payment histories, claiming that the procedures approved by the PSC violate the Act in that they are unreasonable and discriminatory. MCI is seeking real-time access to BellSouth's customer records in order to make an accurate price quotation on MCI's services, as many small business and residential customers are unaware or unable to recall all of the services to which they subscribe. BellSouth states that the information requested by MCI is customer proprietary network information (hereinafter "CPNI") and is therefore confidential under 47 U.S.C. § 222(c). The PSC has held that BellSouth may deny said access unless BellSouth has received a letter of authorization from the customer, or a three-way call occurs between BellSouth, MCI, and the customer.

This issue is another of first impression for the Court. 47 U.S.C. § 222(c) states as follows:

**(1) Privacy requirements for telecommunications carriers**

Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B)

services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

MCI urges this Court to find an exception in § 222(d) which permits a telecommunications carrier to disclose CPNI obtained from the customers. Said subsection contains the following grounds for invoking the exceptions:

(1) to initiate, render, bill and collect for communications services;

(2) to protect the rights or property of the carrier, or to protect users of those services and other carriers from fraudulent, abusive, or unlawful use of or subscription to, such services; or

(3) to provide any inbound telemarketing, referral, or administrative services to the customer for the duration of the call, if such call was initiated by the customer and the customer approves of the use of such information to provide such service.

47 U.S.C. § 222(d).

■ The Court interprets the exceptions to the confidentiality rule to apply to carriers already possessing CPNI within the context of the existing service relationship, and not to carriers seeking access to CPNI. This was also the conclusion by the FCC in its Second Report and Order and Further Notice of Proposed Rulemaking, *Implementation of the Telecomm. Act of 1996: Telecomm. Carriers' Use of Customer Proprietary Network Information and Other Customer Information,* 13 FCCRcd 8061, 8216 [¶ 84] (1998). Furthermore, MCI does not with to obtain this CPNI to initiate, render, bill, or collect for telecommunication services. Instead, MCI plans on using this information for solicitation purposes only. This Court determines that release of CPNI without the customer's written or oral approval would undermine Congress's intent to protect customer privacy against aggressive marketing. *See id.* at 8089 [¶ 37].

■ Upon *de novo* review, the Court concludes that the PSC did not act contrary to the 1996 Act in failing to require BellSouth to provide MCI with customer service records. MCI is free to call a BellSouth customer and solicit his or her business without knowledge of that customer's records with BellSouth. Should MCI come across a customer unaware of the services to which he or she subscribes, MCI can obtain said information by instituting a three-way call. The PSC's decision to protect customer privacy in no way discriminates against MCI, nor does it harm competition between carriers.

## VI. Performance Standards, Reporting Requirements, and an Enforcement Mechanism

The final contention set forth by MCI is the PSC's failure to include in the interconnection agreement, performance standards, reporting requirements, and an enforcement mechanism to prevent BellSouth from ignoring any substantive performance requirements without fear of any meaningful penalty such as for example, liquidated damages.

MCI claims that objective performance standards are needed to enable MCI to know with confidence how long BellSouth will take to provide a requested element so that MCI will be able to tell its potential customers how long it will take to provide the service they have ordered. MCI also claims that reporting requirements need to be implemented to ensure that BellSouth meets its statutory and contractual obligations to determine what level of service BellSouth is providing to itself and its competitors, and therefore whether MCI is receiving the level of quality to which it is entitled. Finally, MCI states that if the PSC does not set forth some type of enforcement mechanism in the interconnection agreement, BellSouth will be free to ignore any substantive performance re-

quirements as it will suffer no meaningful penalty.

BellSouth argues that the aforementioned provisions are not mentioned anywhere in the Act and therefore are beyond the scope of the arbitration proceedings before the PSC. MCI counterargues that the FCC has indicated that proper performance measures are necessary for compliance with the Act.[10] According to MCI, the FCC did not set forth any specific requirements because it found state commissions to be in the best position to do so.

■ This Court is leery to use 47 U.S.C. § 252(c) which permits a state commission to resolve "any open issues and impos[e] conditions upon the parties to the agreement" as a *requirement* that the PSC set performance standards, reporting requirements, and penalty provisions, as MCI suggests. Although a state commission may decide to impose such standards and mechanisms, this Court will not conclude that silence on the part of Congress implies that it is the duty of a state commission to include such provisions in an interconnection agreement. MCI's argument that the absence of said provisions was a violation of the Act by the PSC must fail.

## CONCLUSION

This Court finds that MCI has presented some meritorious arguments and is entitled to limited relief. This Court determines that dark fiber is a UNE of which MCI is entitled to lease in a nondiscriminatory manner from BellSouth. Therefore, this Court will remand the dark fiber issue to the PSC for the purpose of determining a non-discriminatory time-frame in which MCI is required to use all dark fiber leased from BellSouth and a time frame in which BellSouth has a legitimate business purpose for withholding the lease of dark fiber for its own use. This Court also

---

**10.** *See In re Application of Ameritech Michigan Pursuant to § 271 of the Communications Act of 1934, as amended, to Provide In–Region InterLATA Services in Michigan,* Memorandum Opinion and Order, 12 F.C.C.R. 20543 at ¶ 204 (1997).

remands this matter to the PSC for the determination of the appropriate wholesale rate of CSAs between the parties. Finally, this Court overturns the PSC's decision to exclude from resale all short term promotions offered by BellSouth.

**IT IS SO ORDERED.**